**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

CHRISTOPHER D. LYONS                                                                    PLAINTIFF


V.                                        4:04CV002303 JTR


CITY OF CONWAY, ARKANSAS, ET AL.                                      DEFENDANTS


**<u>MEMORANDUM OPINION</u>**

I. Introduction

On April 23, 2007, the Court entered an Opinion and Order (docket entry #46) granting

summary judgment in favor of Defendant, City of Conway, Defendant Randall Aragon, in his official

capacity as Chief of Police for Conway, Arkansas, and Defendant Sergeant Ottie Cowgill, in his

official capacity as an officer of the Police Department, and dismissing Plaintiff's claims under the

Eighth and Fourteenth Amendments.[1]  Plaintiff's only claim that survived summary judgment was

that Defendant Cowgill, in his individual capacity, violated Plaintiff's Fourth Amendment right to

be free from an "unreasonable seizure" when he shot Plaintiff while arresting him for shoplifting.

In denying summary judgment on this claim, the Court noted that there were still unresolved fact

questions surrounding whether Defendant Cowgill had intentionally or accidentally shot Plaintiff.[2]

On March 13, 2008, the parties consented in writing to allow a United States Magistrate

---

[1]United States District Judge J. Leon Holmes entered this Opinion and Order.  As the Court
stated during the trial, it adopts Judge Holmes's Opinion and Order in its entirety.

[2]During the trial, counsel for both sides agreed in their opening statements that Plaintiff's
Fourth Amendment claim turned on how the Court resolved the question of whether Defendant
Cowgill "intentionally" or "accidentally" shot Plaintiff.

Judge to exercise jurisdiction over this case.  (Docket entry #68.)  On April 11, 2008, the parties waived their previous demand for a jury trial and consented to try the case to the Court.  (Docket entry #70.)

On June 10, 2008, the case was tried to the Court.  In his case-in-chief, Plaintiff testified, along with the following witnesses: Carolyn Lyons, Plaintiff's mother; Ronald Anderjack, a firearms and tool mark examiner with the Arkansas State Crime Lab; and Chip Stokes, a retired detective with the Conway Police Department who conducted the Internal Affairs investigation of the shooting.

In presenting his defense, Defendant testified, along with the following witnesses: Shayne Hobbs, a former police officer with the Conway Police Department, who was an eyewitness to the shooting; David Baxter, a North Little Rock policeman who counsel stipulated was an expert witness in the area of firearms safety and firearms training; and Casey Dunn, a Conway police officer who is a friend of Defendant Cowgill.

After considering the testimony of the witnesses, reviewing all of the exhibits, and weighing the evidence, the Court makes the following Findings of Fact and Conclusions of Law.

## II.  Findings of Fact and Conclusions of Law

1.      Sometime after noon on February 27, 2002, Christopher Lyons ("Plaintiff") hitchhiked from his home in Morrilton, Arkansas, to the Kroger store on Oak Street in Conway, with the intention of shoplifting steaks.  Plaintiff was addicted to marijuana, cocaine, and alcohol, and he planned to sell the steaks and use the proceeds to buy drugs.[3]  Plaintiff was thirty years old and had one prior felony conviction for possession of a controlled substance.

---

[3]Plaintiff testified that, for the last four and one-half years, he has been free of drugs and alcohol and that he regularly attends AA meetings held in the Morrilton area.

2.     At approximately 4:30 p.m., Plaintiff entered the Kroger store and stuffed four or five ribeye and T-bone steaks into his pants.  He wore a large coat to make it difficult for store employees to see the steaks.  As he left the store, the manager followed him outside and requested him to stop.  A foot chase ensued across the parking lot to the rear of Colton's Steak House on the other side of Oak Street.

3.     During this foot chase, Plaintiff saw the Kroger store manager on his cell phone and suspected he was talking to the police about where Plaintiff was headed.  After seeing the store manager on his cell phone, Plaintiff expected to be caught by the police.  Plaintiff entered a fenced area at the rear of Colton's Steak House with the intention of disposing of the steaks.  Sergeant Ottie Cowgill ("Defendant") and Patrolman Shayne Hobbs, each driving separate patrol cars, arrived almost immediately after Plaintiff entered the fenced area.

4.     According to the Conway Police Department dispatch log, Defendant and Hobbs got to Colton's Steak House at approximately 4:40 p.m.  Defendant had been a police officer with the Conway Police Department since 1994.  In January of 2002, he was promoted to the rank of sergeant.  Hobbs joined the Conway Police Department in 1996 and had worked with Defendant on many previous occasions.

5.     While driving to the scene, Defendant and Hobbs were advised by the police dispatcher that Plaintiff had shoplifted items from the Kroger store and then fled to the area behind Colton's Steak House.  Officer Hobbs testified that, while he and Defendant knew Plaintiff was a misdemeanor suspect, they had no way of knowing what, if any, other crimes Plaintiff may have committed while inside the Kroger store; whether there were outstanding felony warrants against Plaintiff; or anything about his prior criminal history.

-3-

6.     A wooden privacy fence enclosed the area behind the Colton's Steak House where Plaintiff was hiding.  Defendant looked through the slats in the fence and could see Plaintiff crouching in a corner.  Plaintiff's back was turned away from the gate used to enter this area and his hands were hidden in front of him.

7.     Defendant and Hobbs were both armed with .45 caliber P220 Sig-Saver semiautomatic pistols loaded with hollow point bullets.  These weapons and ammunition were standard issue for officers in the Conway Police Department.

8.     The P220 Sig-Saver is a double-action/single-action pistol, with an external hammer located behind the slide.  In double-action mode, the pistol's trigger performs the dual function of pulling the hammer back to the cocked position *and* then firing the weapon.  In single-action mode, the hammer must be manually cocked, which means the trigger performs the single function of releasing the hammer to fire the weapon.  According to the testimony of David Baxter, an expert witness qualified in firearms safety and firearms instruction, most manufacturers of double-action/single-action semi-automatic pistols set the double-action trigger pull in the range of twelve to thirteen pounds and the single-action trigger pull in the range of five to six pounds.

9.     Defendant and Officer Hobbs entered the enclosed area in a "stacked formation," with Defendant in front and Hobbs behind.  Both officers had their weapons drawn and in double-action mode.  The officers pointed their weapons at Plaintiff, who was still in a crouched position, with his hands hidden, and began to order Plaintiff to stand and face them, with his hands outstretched.[4] According to Hobbs, Plaintiff was slow to obey these commands.

---

[4]Plaintiff's attorney stipulated that, under these circumstances, Defendant and Hobbs were justified in entering the enclosed area with their weapons drawn and pointed at Plaintiff.

10.     After finally turning to face the officers, Plaintiff kept his hands in his front waistband area.  Plaintiff's heavy coat made it difficult for the officers to see his hands.  Both officers began to advance slowly toward Plaintiff, while repeatedly ordering him to show his hands and go to the ground.  Instead of obeying these orders, Plaintiff began to walk slowly toward the officers with his hands still in his front waistband area.[5]

11.     Officer Hobbs provided clear, credible testimony about the events that unfolded next.  When Plaintiff was approximately one arm's length in front of Defendant, he finally released his hands from his waistband and raised and spread his arms.  At this point, Hobbs and Defendant knew that Plaintiff did not have a weapon in his hands.  Hobbs unstacked, *i.e.*, he moved from behind Defendant around his right side to get behind Plaintiff, on Plaintiff's right side, so that he could take him to the ground to be searched and handcuffed.

12.     Hobbs was not wearing a coat, and he had unimpeded access to his holster.  As he went around Defendant, he holstered his weapon and secured the snap to lock his pistol in the holster.  Thus, by the time he got behind Plaintiff and placed his hands on Plaintiff's right shoulder and arm, Hobbs's weapon was secure.

13.     Defendant was wearing a nylon Conway Police Department coat that covered his holster.  According to Hobbs, when he unstacked and went around Defendant's right side, Defendant had his left hand on Plaintiff's left shoulder and was repeatedly "pawing" the gun in his right hand at his holster.  This "pawing" motion involved Defendant repeatedly pushing his gun down toward the holster which was covered by his coat.  Hobbs got behind Plaintiff, placed his hands on

---

[5]Although the officers did not know it at the time, Plaintiff's hands were holding the waistband of his pants to prevent the hidden steaks from falling out.

Plaintiff's right shoulder and arm, and began to push Plaintiff toward the ground. As he did so, he noticed Defendant was now slightly behind Plaintiff's left shoulder, with his left hand on Plaintiff's left shoulder and his right hand still pawing his pistol in a downward motion trying to reholster the weapon.

14.     Plaintiff's testimony about these events is similar to Hobbs's testimony in most respects. According to Plaintiff, he kept his hands in his waistband area to keep the steaks from falling out. He admits he may have consumed one beer that afternoon and acknowledges that, rather than immediately obeying the officers' commands to raise his hands and get on the ground, he walked slowly toward them with his hands in his front waistband area.

15.     Plaintiff testified that, when he got close to the officers, he extended his arms so that they could see his hands and then he *voluntarily* squatted down "in a frog on a lily pad position," with the intention of next going to the ground. Hobbs's testimony is that Plaintiff remained standing and that it was the combined force he and Defendant applied to Plaintiff's shoulders that caused him to squat down "in a frog on a lily pad position." Regardless of how he got there, both Plaintiff and Hobbs agree that this was the position Plaintiff was in when he was shot.

16.     According to Hobbs, after he and Defendant had pushed Plaintiff down into the "frog on a lily pad position," a gun shot rang out. Defendant looked at Hobbs and immediately said words to the effect of: "Shayne, why did you shoot him!" Hobbs, who knew he had already safely holstered and secured his weapon, directed Defendant's attention to the still smoking gun barrel of his weapon, which was now cocked, and said: "It was yours, not mine." According to Hobbs, Defendant became visibly upset and emotional and began to apologize to Plaintiff for shooting him. Hobbs told Defendant that he should leave the area and another police officer escorted Defendant

away.  Hobbs remained with Plaintiff until an ambulance arrived to transport him to the Conway

Hospital.

17.     Plaintiff testified that when the gun went off both officers were behind him and that

he had no idea which officer had fired the shot.  Thus, Plaintiff could provide *no facts* about how or

why the shooting had taken place.  He admitted that, before the gun discharged, neither officer had

threatened to shoot him or otherwise harm him and that he was stunned when he heard the gun shot.

18.     Defendant's testimony was emotional and difficult for him to give.  He stated that,

as a result of this incident, he developed post-traumatic stress disorder ("PTSD").  Thus, he now has

only a vague recollection of the facts surrounding the incident.  He did *not* recall Hobbs being at the

scene before the incident, and his first recollection of Hobbs being inside the fenced enclosure was

hearing him say: "Ottie, it was yours, not mine."  Defendant recalled that he drew his gun as he

entered the enclosed area and that Plaintiff refused to obey his commands to hold out his hands and

go to the ground.  He remembered that, when Plaintiff got to within arm's length of him, Defendant

placed his left hand on Plaintiff's left shoulder to push him down, and he remembered having

difficulty holstering his gun due to his coat.  He remembered repeatedly pushing down with his gun

trying to find his holster.  He did *not* remember firing his gun.

19.     Defendant did not recall ever manually cocking the hammer on his gun to place it in

single-action mode.  He testified that he was trained to keep his right index finger parallel to the slide

and above the trigger guard unless he intended to shoot his gun.  While Defendant does not recall

putting his finger on the trigger, he acknowledged that, because his weapon unquestionably

discharged, he may have inadvertently put his finger on the trigger while trying to holster his

weapon.

20.     Defendant testified that he never intended to shoot Plaintiff and that his gun accidentally discharged as he was struggling to get it holstered while simultaneously pushing down on Plaintiff's left shoulder to get him to go to the ground.  According to Defendant, the trauma from this accidental shooting cost him a career in law enforcement.  The Court finds Defendant's testimony to be sincere and credible.

21.     In the months after the shooting, Defendant experienced difficulty performing his job. Officer Dunn testified that, several months after the shooting, he and Defendant were together in a situation that required Defendant to pull his weapon.  Defendant was unable to do so, and, after the incident, Officer Dunn asked Defendant why he had not drawn his gun.  Defendant replied that he could not make himself do it.  Dunn testified there were other occasions in which Conway Police Department officers reported that Defendant refused to draw his weapon under circumstances that required him to do so.  Finally, Dunn reported that, several months after the shooting incident, he found Defendant's patrol unit parked near the Conway city limits.  Defendant was sitting on the hood of his patrol car smoking a cigarette and refusing to respond to radio calls.  Dunn asked Defendant what was going on, and Defendant replied: "I can't do this job anymore."

22.     On April 20, 2004, Dr. Asim Raza, a psychiatrist, diagnosed Defendant with chronic PTSD resulting from the February 27, 2002 shooting.  *See* Defendant's Exhibit No. 7.  In his psychiatric evaluation, Dr. Raza noted that, since the 2002 shooting, Defendant had not been able to patrol the streets and that he now worked behind a desk in the police department and wore civilian clothes.  Plaintiff told Dr. Raza that "when he thinks about wearing his uniform he starts throwing up" and that he can no longer carry a gun or "handle a suspect again."  *Id.*

23.     On July 26, 2004, Conway Police Chief Randall Aragon wrote a letter to the Arkansas

Local Police and Fire Retirement System supporting Defendant's application for duty-related disability based on the psychological problems he had experienced since the February 27, 2002 shooting.[6] Effective August 1, 2004, Defendant was granted duty-related disability. Since that time, Defendant has worked in civil code enforcement for the City of Conway. In this job, Defendant is not required to wear a uniform or carry a gun.

24.     As part of the Conway Police Department's Internal Affairs investigation of the shooting, Defendant's gun was sent to the Arkansas State Crime Lab to determine if the weapon was defective. Ronald Anderjack, a firearms and tool mark examiner for the Crime Lab, examined the weapon and prepared a Report of Laboratory Analysis dated April 15, 2002. *See* Defendant's Exhibit No. 5. Anderjack found no defects in the weapon. He also determined that, in the double-action mode, Defendant's pistol had a trigger pull of 12 ½ to 13 ½ pounds and that, in the single-action mode, Defendant's pistol had a trigger pull of 5 to 5 ½ pounds. Finally, Anderjack found "no mechanical condition . . . which would cause this pistol to fire without the trigger being depressed." *See id.*

25.     In March of 2002, Chip Stokes, a detective with the Conway Police Department, was assigned to perform the Internal Affairs investigation of the February 27 shooting. Stokes interviewed Defendant and Hobbs and looked at photographs of the area where the shooting took place. He did not visit the scene of the shooting nor did he interview the Plaintiff. He also did not have the benefit of the report on the firearm from the Arkansas Crime Lab because it had not yet been received by the Conway Police Department.

---

[6]*See* docket entry #24, Exhibit E to Defendant's Statement of Undisputed Facts filed in support of Defendant's Motion for Summary Judgment.

26.     In his final report, dated April 16, 2002, Stokes concluded that Defendant accidentally discharged his weapon and that he found "no indication Sgt. Cowgill had any intention to fire his weapon or cause injury to the suspect."  Finally, Stokes found the "discharge could have been prevented if Sgt. Cowgill had been able to secure his weapon, prior to taking control of the suspect, and/or maintained his finger outside the trigger."  *See* Defendant's Exhibit No. 3, pages 10-11.

27.     During his trial testimony, Stokes stated that he believed Defendant had allowed his finger to be placed on the trigger during the reholstering process.  He then either squeezed the fingers on his right hand as a sympathetic nerve response to Defendant's left hand squeezing Plaintiff's left shoulder or he allowed the downward thrust of the gun hitting the top of the holster area to force the trigger into contact with his finger, which caused the gun to discharge.  According to Stokes, he investigated until he believed he knew what had occurred regarding the shooting.  He admitted he did not go into a lot of depth in his investigation and that it would have been better if he had interviewed the Plaintiff.

28.     Based on Stokes's Internal Affairs report, Conway Police Chief Randall Aragon sent Defendant a letter of reprimand dated May 28, 2002.  *See* Plaintiff's Exhibit No. 7.  In this letter, Aragon relied on Stokes's report to conclude that "while attempting to holster your weapon it accidentally discharged striking the suspect."  As punishment, Defendant was required to take remedial training in firearms safety which, at a minimum, encompassed: (1) "correct holstering techniques"; and (2) "taking control of suspects while simultaneously in possession of a firearm."

29.     Officer Dunn testified that, about two days after the February 27, 2002 shooting, he stopped by Defendant's house because he heard Defendant was having a hard time.  Dunn asked Defendant if he could examine the coat he was wearing at the time of the shooting to see if he could

find any evidence that the hammer of the pistol might have snagged on the coat, causing the gun to

cock and go into single-action mode.  Defendant's wife located the coat and brought it to Dunn.  He

found two tears in the fabric of the coat in the area where the holster rode against it.  Dunn told

Defendant that he believed these tears showed that the hammer of his gun must have cocked when

it came in contact with the coat as Defendant struggled to reholster the weapon.  Dunn viewed these

tears in the coat as important evidence that should be brought to the attention of the Internal Affairs

investigator.  He urged Defendant to turn the coat over to Internal Affairs.  According to Dunn,

Defendant later told him that he had done so.   Defendant's coat was introduced into evidence as

Defendant's Exhibit No. 1.

      30.      Stokes testified that no one ever showed him the coat and that the first time he saw

it was while he was on the witness stand.  The transcript of Stokes's March 28, 2002 interview of

Defendant reveals that he gave an at best vague explanation of what might have caused his pistol to

become cocked:

> Stokes:           If you do not know the exact cause what do you think caused the weapon to discharge?
>
> Cowgill:         The only thing I can tell you is what I've been told. . . .  I was told that it appeared to have hung on my, the hammer hung on my pocket.  I was told that with the hammer being back and not aware of it that I think they said it was a pound and a half trigger pull.  After the hammer's back and they said that after when I was trying to put it in the holster that a piece of my holster might have discharged it. . . .

*See* Defendant's Exhibit No. 3 at page 4.

      31.      Defendant does not tell Stokes whether the pocket he is referring to is located on his

pants or his coat.  Similarly, Defendant says nothing about any tears in his coat that might have been

caused by the hammer of his gun as he repeatedly tried to reholster the weapon.  Finally, Defendant

does not identify for Stokes the name of the person who provided him with this information, and he never mentions the word "coat," much less gives Stokes an explanation of the role the coat may have played in the accidental discharge of his gun.

32.     If, as Dunn testified, the two tears were present in the coat two or three days after the shooting, there is simply no rational explanation for Defendant not turning the coat over to Internal Affairs and explaining to Stokes that the two tears were strong evidence that his pistol hammer must have cocked when it hung in the fabric and tore its way loose.  Suffice it to say, the Court finds it troubling and suspicious that, until the trial began in this case, only Defendant and Dunn were aware of these tears in the coat, and neither of them brought this matter to the attention of Stokes.

33.     David Baxter testified as an expert witness in the areas of firearms safety and firearms training.[7]  According to Baxter, there were several probable explanations of why Defendant's gun accidentally discharged.  Baxter used Defendant's coat (Defendant Exhibit No. 1), holster (Defendant's Exhibit No. 12), and gun (Defendant's Exhibit No. 11) to recreate how it may have accidentally discharged.  Baxter testified that, when he repeatedly thrust the gun downward, striking the holster or belt area, the hammer on the gun often cocked, putting the weapon in single-action mode.[8]  Baxter also examined the two tears in Defendant's coat and expressed the opinion that, if the tears were made by the hammer of Plaintiff's gun, this may have cocked the weapon.  It was Baxter's opinion that, in repeatedly "pawing" his gun against his holster and coat, Defendant unknowingly cocked the hammer.

---

[7]As indicated previously, Plaintiff's counsel stipulated that Baxter was qualified to testify as an expert in both of these areas.

[8]In this mode, Defendant would only have to exert 5 to 5 ½ pounds of pressure on the trigger to fire the weapon.

34.     Relying on the work of Lewinski and Heim, with the Force Science Research Center, Baxter explained how the nerves associated with the muscles in one hand which is exerting force can cause the nerves and muscles in the other hand to squeeze the fingers in sympathy with the hand that is actually applying the force.  Lewinski has documented how this sympathetic nerve response can cause a police officer, trying to control a suspect with his left hand, to squeeze the fingers on his right gun hand in response to the pressure being applied by his left hand.  If such an officer has his right index finger on the trigger of his pistol, this can cause him to involuntarily fire the weapon.

35.     Baxter also explained that, keeping the index finger in a straight position beneath the slide and above the trigger guard is not a normal grip position.  According to Baxter, it is normal human physiology for the fingers of the hand to be held in a slightly curled position.  Thus, the natural grip position for holding a handgun is to place the index finger in a curled position on the trigger.  While police officers receive extensive training aimed at preventing them from assuming this natural grip position, under stress, officers sometimes revert to the more normal grip position.

36.     Baxter expressed the opinion that Defendant unknowingly put his finger on the trigger of his gun  while trying to reholster it.  During his repeated efforts to push the gun down into the holster, he inadvertently cocked the weapon.  When Defendant began to squeeze Plaintiff's left shoulder with his left hand and push Plaintiff toward the ground, Baxter believes Defendant's right hand squeezed as a sympathetic nerve response to the squeezing pressure Defendant was exerting with his left hand.  Since Defendant's right index finger was on the trigger when his finger squeezed, this caused the gun to discharge.  Baxter also expressed the opinion that, even if the gun was still in the double action mode, Defendant's sympathetic nerve response, while under stress, would have been sufficient to cause him to apply the 13 to 13 ½ pounds of pressure necessary to cause the gun

-13-

to fire.  Thus, Baxter expressed the opinion that this was an accidental shooting and that he was aware of no facts which suggested Defendant intended to shoot Plaintiff.

37.     The bullet that struck Plaintiff entered the back of his upper left arm, about three inches below the top of his shoulder, and exited the underside of his arm, without hitting the humerus.  Because Plaintiff was in a squatting "frog on a lily pad position" when the bullet exited his arm, it entered his left leg, approximately four inches above the knee.  The bullet missed the femur and lodged in the muscles at the back of his leg.

38.     According to page 1 of Defendant's Exhibit No. 6, when Plaintiff arrived at the Conway Hospital, he spoke with Conway police officer, Jon Cole, who was assigned to the emergency room area.  According to Officer Cole's written report, Plaintiff told him "the gun just went off, it was an accident, I guess, I just can't figure it out."  While Plaintiff testified at trial that he did not recall making such a statement to a policeman in the Conway Hospital emergency room, in his deposition he admitted talking to a police officer in the emergency room area.  Importantly, the statement Plaintiff made to Officer Cole is consistent with Hobbs's testimony that Defendant immediately apologized to Plaintiff for inadvertently shooting him.  Otherwise, Plaintiff would have had no basis for telling officer Cole that he believed he had been shot by "accident," since he admitted he did not even know which officer had fired his gun.

39.     Surgeons at the Conway Hospital cleaned and closed Plaintiff's wounds and removed the bullet that was still lodged in the back of his left leg.  After two days in the hospital, Plaintiff was released and returned to his mother's home in Morrilton where he lives.  According to Plaintiff, since the shooting, he has experienced permanent weakness and numbness in his left arm and leg.  He has difficulty lifting a one gallon container of milk, and his left leg gives out if he walks more than

twenty minutes.[9]

40.     According to the Eighth Circuit, a "Fourth Amendment seizure occurs when an officer restrains the liberty of an individual through physical force or show of authority." *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003) (citing *Terry v. Ohio*, 392 U.S. 1, 19 n. 16 (1968)). To violate the Fourth Amendment, the restraint in liberty must be unreasonable and "must be effectuated '*through means intentionally applied*.'" *Id.* at 846-47 (quoting *Brower v. County of Inyo*, 489 U.S. 593, 596-97 (1989)). Thus, in order for Plaintiff to prevail on his Fourth Amendment claim, he must prove by a preponderance of the evidence that: (1) it was objectively "unreasonable" for Defendant to shoot Plaintiff (a clear restraint of a liberty interest); and (2) Defendant's shooting of Plaintiff was effectuated "through means intentionally applied," *i.e.*, he intended to shoot Plaintiff.

41.     In determining if a police officer's use of force was objectively "unreasonable," the Eighth Circuit has held that the following factors must be considered: "'[(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officer or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight.'" *McCoy*, 342 F.3d at 848 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). "It may also be appropriate to consider the extent of any injuries sustained by the suspect, and standard police

---

[9]In 2005 or 2006, Plaintiff was declared to be disabled by the Social Security Administration and now receives SSI benefits. Plaintiff's physical limitations primarily appear to be related to his having been stabbed with a butcher knife, in the chest and stomach area, in 1998. However, he testified that his left arm and leg limitations from the shooting also played a role in his being declared disabled. The Plaintiff's disability determination also included a psychological component. A consulting physician diagnosed Plaintiff with antisocial personality disorder and assigned him a GAF score of 45.

Plaintiff's attorney raised the issue of Plaintiff's disability during his direct examination of Plaintiff. The Court does not view the fact that Plaintiff has been determined to be disabled to have any relevance to the issue of liability.

procedures." *Nelson v. County of Wright*, 162 F.3d 986, 990 (8th Cir. 1998) (citing *Foster v. Metropolitan Airport Comm'n*, 914 F.2d 1076, 1082 (8th Cir. 1990); *Ludwig v. Anderson*, 54 F.3d 465, 472 (8th Cir. 1995)) (citations omitted).

42.     In this case, the Court has no difficulty finding that Plaintiff has proven by a preponderance of the evidence that Defendant's use of deadly force was unreasonable and unjustified.  At the time of the shooting, Defendant knew Plaintiff was suspected of shoplifting, which is only a misdemeanor.  At the time Plaintiff was shot, he was in a position that did not pose an immediate threat to the safety of Defendant or anyone else.  Finally, at the time of the shooting, Plaintiff was not actively resisting arrest or attempting to evade arrest by flight.  Thus, Defendant's shooting of Plaintiff clearly constituted an "unreasonable" restraint of Plaintiff's liberty.

43.     However, as to the second essential element of Plaintiff's Fourth Amendment claim, there is virtually no evidence to support the inference that Defendant intended to shoot Plaintiff when he fired his gun.  Perhaps the strongest evidence that this shooting was accidental is Hobbs's testimony that, as soon as the shot was fired, Defendant asked Hobbs why he, Hobbs, had shot the Plaintiff.  Hobbs had to point out to Defendant that it was *his* still smoking. 45 that had fired the shot, not Hobbs's safely holstered weapon.  Similarly, Defendant's immediate apology to Plaintiff for having shot him and his subsequent PTSD strongly weigh against Defendant having any intention of shooting Plaintiff.  Finally, the physical evidence strongly supports the shooting being an accident.  Defendant's repeated downward thrusts of his gun, in a failed attempt to holster the weapon, continued from the time Hobbs went around Defendant and behind the Plaintiff until Defendant's gun discharged.  As Baxter testified, this downward thrusting motion could have easily cocked the gun, and the downward trajectory of the bullet, into the rear of Plaintiff's arm and then his leg, is

entirely consistent with the gun accidentally discharging as Defendant sought to reholster the weapon.

44.    Thus, the Court finds that Plaintiff has failed to prove by a preponderance of the evidence that Defendant's discharge of his gun was effectuated "through means intentionally applied."  While Defendant may have been negligent in shooting Plaintiff, "the Fourth Amendment protects citizens against willful shootings and not accidental, but otherwise reasonable ones."  *Owl v. Robertson*, 79 F.Supp.2d 1104, 1114 (D. Neb. 2000).  *Accord*: *Brice v. City of York*, 528 F.Supp.2d 504 (M.D. Pa. 2007); *Troublefield v. City of Harrisburg*, 789 F.Supp. 160, 166 (M.D. Pa. 1992).

### III.  Conclusion

Consistent with the Findings of Fact and Conclusions of Law, the Court will enter a Judgment in favor of Defendant, and all of Plaintiff's claims will be dismissed, with prejudice.

DATED this 16th day of June, 2008.

_____
UNITED STATES MAGISTRATE JUDGE